## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **WALGREEN CO.,** ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. |
| ) | |
| v. ) | **JURY DEMANDED** |
| ) | |
| **AKTIVE HEALTH, LLC,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

## COMPLAINT

Walgreen Co. ("Walgreens"), by and through the undersigned counsel, hereby files this Complaint against Aktive Health, LLC ("Active") (collectively, the "Parties"), alleging as follows:

## I.   INTRODUCTION

1.     This is an action for breach of contract and specific performance based upon Aktive's unexcused breach of its obligations under the Parties' express contract.  At the height of the Covid-19 Pandemic, Aktive sought to take advantage of escalating consumer demand for legitimate disinfectant products by approaching Walgreens with an offer to supply Walgreens with "Aktive General Disinfecting & Cleaning Wet Wipes" (the "Aktive Wipes").  Assured by Aktive's representations that the Aktive Wipes were registered with the United States Environmental Protection Agency ("EPA"), and thus authorized to be legally distributed and sold as a general disinfectant pending full EPA approval, Walgreens and Aktive entered into the General Trade and Electronic Data Interchange Agreement (the "GTA")[1] on July 13, 2020.  Over the course of the third quarter of 2020, Walgreens then made 105 purchase orders for Aktive Wipes for approximately 4.2 million units and paying Aktive $10,073,228.  The purchase of the Aktive

---

[1] A true and correct copy of the GTA is attached hereto as **Exhibit 1.**

Wipes, and any other purchase orders by and between Walgreens and Aktive, is expressly governed by the GTA. Through the GTA, Aktive specifically warranted, *inter alia*, that the Aktive Wipes were in full compliance with all applicable laws and regulations. The GTA further provided Walgreens with the unrestricted right to rescind its purchase of Aktive Wipes and receive a full refund of any amounts paid to Aktive for the Aktive Wipes.

2.      Beginning in October of 2020, Walgreens started receiving complaints from consumers and government agencies concerning the legitimacy of representations made on the Aktive Wipes packaging. When Walgreens informed Aktive of these concerns, Aktive dismissed them, insisting that Aktive Wipes were not only EPA-registered, but EPA-approved. This turned out to be false, since on February 17, 2021, Aktive informed Walgreens *for the first time* that the EPA had begun investigating Aktive Wipes' authorization on December 13, 2020, culminating in an EPA Stop Sale, Use or Removal Order (the "SSURO").[2] Thus, Aktive breached the warranties and representations contained in the GTA, and further, has refused to allow Walgreens to exercise its unrestricted right to rescind purchase of the Aktive Wipes for a full refund.

3.      As a direct and proximate result of Aktive's unexcused breach of the GTA, Walgreens has suffered damages of not less than $10,073,228.

## II.      PARTIES

4.      Walgreens is an Illinois corporation with its principal place of business at 200 Wilmot Road, Deerfield, Illinois, 60015. Walgreens is in the business of providing consumer goods and services, as well as pharmacy, health, and wellness services, through thousands of retail drugstores throughout the United States.

---

[2] A true and correct copy of the EPA's SSURO is attached hereto as **Exhibit 2.**

5.     Aktive Health, LLC is a domestic limited liability company organized under the laws of the state of Texas.  Aktive is managed by its managers, William Nicholson, Jennifer Wolbers, and Tony Gaines, who are residents of Texas.  Aktive's registered agent is William W. Meier III, who may be served with process at 1445 Ross Avenue, Suite 2400, Dallas, TX 75202.

### III.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the citizenship of Walgreens and Aktive is diverse and the amount in controversy exceeds $75,000.

7.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims made in this lawsuit occurred within the Northern District of Illinois. Moreover, pursuant to the GTA, the Parties "consent[ed] to the exclusive jurisdiction of the courts of the State of Illinois or Federal District Court of the Northern District of Illinois and agree[d] to waive all objections as to venue and *forum non conveniens*."

### IV.     FACTUAL ALLEGATIONS

**A.     Aktive's Solicitation of Walgreens and Formation of the GTA.**

8.     In May of 2020, Aktive's CEO Tony Gaines approached Walgreens to engage in discussions for the purchase of Aktive Wipes.

9.     On or about July 9, 2020, Aktive represented to Walgreens in email communications that Aktive Wipes could be packaged and sold as a "disinfectant" product while EPA approval was pending.

10.     Assured by Aktive's representations that the Aktive Wipes were approved for lawful distribution under all applicable federal, state, and local laws and regulations, Aktive and Walgreens entered into the GTA on July 13, 2020.  *See ibid* Exhibit 1.

3

11.    The preamble of the GTA states that all subsequent purchase orders made by Walgreens are governed by the terms of the GTA.

12.    Section C, 2 of the GTA provides that: "Walgreen shall have the **unrestricted right to rescind** its purchase of the merchandise from Vendor both before and after acceptance of such merchandise by Walgreen and return any remaining merchandise to Vender for **full refund of any amounts paid** for such merchandise." (emphasis added).

13.    Section C, 6(b) of the GTA represents that Aktive's merchandise was and is "**in compliance with all Federal, State and Local statutes, regulations and ordinances**." (emphasis added).

14.    Section C, 6(c) of the GTA states that Aktive had and has "competent, reliable evidence to substantiate any and all claims made in connection with its merchandise, including the product packaging and all advertising relating thereto."

15.    Section C, 6(d) of the GTA represents that Aktive's merchandise was and is "not defectively designed, manufactured, packaged, [or] labeled."

16.    Section C, 6(f) of the GTA represents that Aktive's merchandise and packaging were not in violation of all applicable "Federal, state or local laws or regulations."

17.    Finally, Section C, 11 of the GTA requires that Aktive "provide Walgreen with written notice of any investigation, action or inquiry related to the merchandise instituted by . . . any Federal, state or municipal regulatory authority within two business days of the commencement of any such investigation, action or inquiry . . ."

18.    After the GTA was executed, Walgreens placed 105 purchase orders for Aktive Wipes, amounting to approximately 4.2 million units, for which Walgreens paid $10,073,228 to Aktive.

19.     The Parties did not sign any written modification of the GTA that contradicted or modified any of its terms.

**B.      Aktive Breaches the GTA.**

20.     Aktive represented to Walgreens that the Aktive Wipes could be sold as a "disinfectant" while the product was "registered" with the EPA and pending final approval.

21.     Thereafter, Aktive made repeated representations to Walgreens regarding the status of EPA approval and the legal distribution of Aktive Wipes, stating on July 22, 2020 that the "EPA process is moving great."

22.     In October 2020, Walgreens received complaints from consumers and governmental authorities concerning representations that Aktive made on Aktive Wipes packaging, including but not limited to its labeling as a "disinfectant" that killed bacteria.

23.     Walgreens informed Aktive of these complaints, to which Aktive responded that the Aktive Wipes were not only EPA-registered, but they were also EPA-approved.  This was simply not true.

24.     On December 13, 2020, the EPA sent Aktive a Notice of Potential Violation and Opportunity to Confer letter (the "Notice").  Aktive failed to notify Walgreens that this investigation was ongoing in accordance with the GTA, including the issuance of the Notice.

25.     On February 17, 2021, weeks after it was entered, Walgreens was provided with a copy of the SSURO concerning the EPA's determination that the Aktive Wipes did not comply with the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136(a).

26.     Aktive did not timely provide Walgreens with written notice of the EPA's Notice or SSURO as required by Section C, 11 of the GTA.

27.     The SSURO confirms that Aktive Wipes were, in fact, not approved by the EPA as a disinfectant that killed bacteria pursuant to Section 3 of FIFRA.

28.     Because Aktive Wipes were not fully registered and approved for distribution as a "disinfectant" that killed bacteria by the EPA, they could not be sold to the public.

29.     As such, the EPA concluded that Aktive distributed Aktive Wipes in violation of Section 12(a)(1)(A) of FIFRA, 7 U.S.C. § 136j(a)(1)(A) and ordered that Aktive immediately cease the sale of Aktive Wipes through the SSURO, which was also binding on Walgreens which sold the Aktive Wipes in its stores.

30.     Upon receiving notice of the SSURO, Walgreens immediately removed Aktive Wipes from all of its stores nationwide.

31.     Thereafter, as it was no longer able to sell the remaining inventory of Aktive Wipes, Walgreens attempted to enforce the terms of the GTA by requiring Aktive to accept return of the merchandise and refund Walgreens for this remaining inventory through its unrestricted rights under Section C, 2 of the GTA.

32.     Walgreens demanded that Aktive honor the terms of the GTA in its letter to Aktive of July 19, 2021, but Aktive has steadfastly refused to abide by Section C, 2 of the GTA and accept return of the merchandise purchased by Walgreens and issue a full refund to Walgreens.

## V.     CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

33.     Walgreens re-alleges Paragraphs 1-32 as if fully set forth herein.

34.     Walgreens and Aktive validly executed the GTA on July 13, 2020.

35.     Walgreens thereafter paid $10,073,228 to Aktive through 105 purchase orders for Aktive Wipes, all of which are subject to the terms of the GTA, and through which Walgreens has an unrestricted right of return and to rescind its purchase even after the merchandise is accepted.

36.     Aktive has breached Section C, 2 of the GTA by refusing to accept return and refund Walgreens for the Aktive Wipes.

37.     As a proximate result of Aktive's breach of the GTA, Walgreens has sustained damages which include the amounts paid to Aktive for Aktive Wipes, not less than $10,073,228.

## COUNT II: SPECIFIC PERFORMANCE

38.     Walgreens re-alleges Paragraphs 1-32 as if fully set forth herein.

39.     Walgreens paid $10,073,228 to Aktive through 105 purchase orders for Aktive Wipes, which were subject to the GTA that Walgreens and Aktive executed on July 13, 2020.

40.     The GTA is a valid and enforceable contract and Walgreens has fully complied with its obligations under this contract.

41.     Walgreens is ready, willing, and able to perform its obligations under Section C, 2 of the GTA and has exercised its unrestricted right to rescind the purchase of the Aktive Wipes.

42.     Aktive refuses to comply with Section C, 2 of the GTA by accepting return of the Aktive Wipes which Walgreens still has in its possession and is unable to sell because of the SSURO.

43.     Walgreens seeks specific performance of Section C, 2 of the GTA by requiring Aktive to accept return of the unsold Aktive Wipes, and refund Walgreens the sums paid for those unsold Aktive Wipes.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Walgreens respectfully requests:

7

a.  Damages for Aktive's various breaches of contract described in Count I in an amount not less than $10,073,228;

b.  Specific performance of Section C, 2 of the GTA as described in Count II, requiring Aktive accept return and issue a refund for all unsold Aktive Wipes;

c.  Costs of this action, including reasonable attorneys' fees, pursuant to Section D, 4 and D, 9 of the GTA;

d.  Pre-judgment and post-judgment interest; and

e.  Such other relief this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Walgreen Co. hereby demands trial by jury in this case.

Dated this 11th day of April, 2022.

By: **Christopher Carmichael**
Christopher W. Carmichael
HENDERSON PARKS, LLC
140 S. Dearborn St., Suite 1020
Chicago, Illinois 60603
Tel: (312) 262-2900
Fax: (312) 262-2901
ccarmichael@henderson-parks.com

VERNON M. STRICKLAND (*Pro Hac Vice pending*)
WARGO & FRENCH LLP
999 Peachtree Street, N.E., 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501
vstrickland@wargofrench.com

ANTHONY R. YANEZ (*Pro Hac Vice pending*)
WARGO & FRENCH LLP
201 S. Biscayne Blvd. Suite 1000
Miami, Florida 33131
Telephone: (305) 777-6060
Facsimile: (305) 777-6061

8

ayanez@wargofrench.com
***Attorneys for Plaintiff Walgreen Co.***

# EXHIBIT 1

2004-3433

**WALGREEN CO. GENERAL TRADE AND ELECTRONIC DATA INTERCHANGE AGREEMENT**
Rev. 12/17/2019

**SIGNATURE PAGE**

THIS WALGREEN CO. GENERAL TRADE AND ELECTRONIC DATA INTERCHANGE AGREEMENT ("**Agreement**"), attached hereto, together with all attachments and exhibits attached hereto, is by and between WALGREEN CO., on behalf of itself and its U.S. domestic and Puerto Rico wholly-owned subsidiaries and affiliates ("**Walgreen**") and the company named below ("**Vendor**").

**BACKGROUND**

This Agreement sets forth the terms and conditions under which the parties agree to facilitate their purchase and sale transactions. The terms and conditions contained herein shall apply to all merchandise, excluding pharmaceutical drug products and alcoholic beverages, sold by Vendor, directly or indirectly through its distributors, to Walgreen. Terms used herein and not otherwise defined shall have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois (the "UCC").

**AGREEMENT**

In consideration of the foregoing premises (which are incorporated by reference herein) and the mutual covenants and conditions set forth below, the Parties hereto, intending to be legally bound, have signed this Agreement to be effective as of the last date signed. Each party hereto warrants and represents that its respective signatory who has signed this Walgreen Co. General Trade And Electronic Data Interchange Agreement below is on the date hereof duly authorized by all necessary and appropriate corporate action to execute this agreement on behalf of such party.

**VENDOR'S SIGNATURE:**

| Vendor Company Name: <br> Aktive Health LLC | Authorized Representative Name: <br> Scott Hanslip | Signature Date: |
|---|---|---|
| Vendor Company Address: <br> 3300 Reagan St. <br> Dallas, TX 75219 | Authorized Representative Title: <br> National Account Sales | 7/10/20 |

**WALGREEN SIGNATURE:**

| Walgreen Principal Address: <br> Walgreen Co. <br> 200 Wilmot Road <br> Deerfield IL 60015 <br> USA | Walgreen Authorized Representative: <br> Glenn Figenholtz <br> VP/GMM | Effective Date: <br> 7/13/20 |
|---|---|---|

## A. DELIVERY CONDITIONS

1) Excess transportation costs which are incurred by Walgreen in connection with split shipments or on any shipment made contrary to shipping instructions will be charged to Vendor.

2) Excess freight costs resulting from errors in the classification of merchandise shipped that are incurred by Walgreen will be charged back to Vendor.

3) Time of delivery is of the essence for each transaction. Walgreen reserves the right to cancel all or any part of any transaction if merchandise is not delivered on the date specified, and the acceptance by Walgreen of any previous or future deliveries on dates other than those specified shall not constitute a waiver of Walgreen's rights hereunder. Any merchandise received on a date other than the date specified shall be held subject to the Walgreen's right to reject such merchandise.

4) Vendor shall declare replacement value on all Parcel Post, United Parcel or other carrier's shipments. Vendor may affect transit insurance with respect to marine shipments at Vendor's cost.

5) Delivery to a consolidation point shall be at Vendor's expense.

6) Vendor shall retain title to the merchandise and risk of loss or damage thereto until said merchandise is delivered to and accepted by Walgreen at the location(s) designated by Walgreen, unless otherwise agreed by the parties. If Walgreen orders merchandise on a consignment basis, title and risk of loss or damage to such merchandise will remain with Vendor as described in a separate Consignment Business Agreement, which is incorporated herein by this reference.

## B. CASH DISCOUNT

1) Under Walgreen's end of month ("E. O. M.") dating terms, payment for merchandise shipped by Vendor after the 20th of the month will be made by Walgreen as if the merchandise had been shipped on the first day of the following month. Vendor's invoice shall be mailed at the time of shipment, unless otherwise agreed upon by the parties in writing or in the event that the merchandise is being purchased pursuant to a "Consignment", "Pay on Scan", or other similar terms. In such instances, the payment terms shall be those set forth in the respective purchase order or in an additional business agreement entered into between the parties.

2) The cash discount period will be computed either from the date of acceptance by Walgreen, or from the date of Walgreen's receipt of correct invoices prepared in accordance with the terms of the purchase order, whichever is later. The date of invoice cash discount period shall be calculated based upon the longest average transit time to Walgreen's destination designated for delivery.

## C. CONDITIONS OF ORDER

1) Vendor's performance shall be in accordance with these terms, dating and conditions. Any other terms in Vendor's acceptance are rejected unless agreed to in writing and signed by Walgreen's authorized representative. Walgreen shall pay item cost in effect as of the date of issue of Walgreen's purchase order, or as otherwise agreed to by the parties. All payments will be made in U.S. dollars.

2) Walgreen may return, at Vendor's expense, or cancel a purchase order, and receive a full refund for all merchandise in excess of that ordered or which is defective or tainted or which varies from the sample from which or specifications for which the purchase order was placed, or for Vendor's failure to comply with Walgreen's shipping or billing directions or with these terms including, without limitation, the representations and warranties contained herein. In addition to Walgreen's rights at law or in equity, Walgreen reserves the right to return at Vendor's expense any merchandise, or cancel the purchase order, and receive a full refund, where a claim is made that the use or resale of the merchandise by Walgreen infringes any alleged patent, trademark, intellectual property, or copyright rights. In addition, if a purchase order is designated as a "Guaranteed Sale," "Sale and Return," "Sale or Return," "Consignment" or "Vendor Returnable" transaction, Walgreen shall not be obligated to pay for any merchandise until after it is sold by Walgreen in accordance with terms agreed upon by the parties. In addition, Walgreen shall have the unrestricted right to rescind its purchase of the merchandise from Vendor both before and after acceptance of such merchandise by Walgreen and return any remaining merchandise to Vendor for full refund of any amounts paid for such merchandise.

3) Vendor shall have no right to use, sell or otherwise dispose of any merchandise or packaging that displays Walgreen's name, trademarks or intellectual property (including any production overruns or merchandise returned by Walgreen) without the prior written authorization of Walgreen.

4) Walgreen may be entitled to credits, offsets, service fees, deductions or charge backs (collectively, "Credits") for (a) merchandise disposition (i.e., destruction or return of unsaleable or guaranteed sale merchandise, including but not limited to Credits taken pursuant to Walgreens Unsaleables Policy at https://vendor.walgreens.com); (b) promotional, advertising, artwork, and/or marketing allowances (i.e., deals lowering the price of an item sold during a particular time period, or to advertise with signage or in Walgreens' circular, including but not limited to Credits taken pursuant to Walgreen's deal system or any successor system specified by Walgreen; or (c) costs arising under or subject to Vendor's defense and indemnity obligations as set forth in this Agreement. Walgreen may take such Credits against any amounts otherwise due to Vendor arising from or under any transaction between Vendor and Walgreen, including transactions unrelated to that which gave rise to Walgreen's right to a Credit,

5) The product identification ("ID") number or barcode appearing on any carton, container, packaging or product shipped to Walgreen must be the same as that product ID number or barcode for the same merchandise previously supplied to Walgreen. If the product ID number differs, Walgreen shall be entitled to charge back and take credit for Walgreen's costs incurred as a result of such differences in product ID number or barcode which costs shall, in any event be deemed not less than $500.00 plus $10.00 for each item delivered with an incorrect product ID number or barcode multiplied by the number of Walgreen's stores stocking the item. Any product ID

number Confirmation Report heretofore or hereafter issued by Walgreen, if any, in connection with any item ordered is, by reference, incorporated herein and made a part hereof.

6) Vendor represents and warrants that: (a) the merchandise, the packaging thereof, and any related materials provided by Vendor do not infringe or otherwise violate the patent, trademark, intellectual property, copyright, trade secret or any other right of another party; (b) the merchandise and any claim, packaging, advertising, label or labeling, or other consumer material are in compliance with all Federal, State and Local statutes, regulations and ordinances including, but not limited to, the Federal Trade Commission Act, the Consumer Products Safety Act, and the Food, Drug and Cosmetic Act ("FD&C Act"), and all claims made by Vendor in any packaging, advertising, label or labeling, advertising, or other consumer material in connection with any merchandise or Vendor brand relating to merchandise shall be true and shall have been substantiated at the time that such claims are made; (c) Vendor has competent, reliable evidence to substantiate any and all claims made in connection with its merchandise, including the product packaging and all advertising relating thereto and agrees to provide Walgreen with copies of such substantiation upon request; (d) the merchandise is not defectively designed, manufactured, packaged, labeled, or inherently dangerous, and does not breach any express or implied warranties of any kind; (e) the merchandise and its packaging, comprising each shipment or other delivery hereafter made by vendor to (or on the order of) Walgreen, is hereby guaranteed, as of the date of shipment, to not be adulterated, misbranded, defaced, altered, repackaged or rebundled, (f) the merchandise, and its packaging or any advertising or promotional material relating thereto, is not in violation of the FD&C Act or any other applicable Federal, state or local laws or regulations; (g) the merchandise is genuine product intended for sale in the United States (and all Territories), and not merchandise which may not, under the provisions of Section 404, 505, or 512 of the FD&C Act, be introduced into interstate commerce; (h) the merchandise is not subject to any governmentally required or requested recall or any other recall; (i) the merchandise is free and clear of any and all security interests and other liens or encumbrances; (j) with respect to any merchandise manufactured in countries other than the United States, neither Vendor nor any of its suppliers shall use child labor as defined by the country of origin, prison labor or involuntary labor; (k) all merchandise provided by Vendor is of merchantable quality and fit for the purpose for which it is intended; and (l) where applicable, Vendor will comply with the reporting requirements promulgated by the Dietary Supplement and Nonprescription Drug Consumer Protection Act. In the event that Vendor sells to Walgreen any merchandise which constitutes fresh produce, Vendor represents and warrants to Walgreen that it has programs in place to ensure Vendor compliance with the current Good Agricultural Practices ("GAPs") and current Good Manufacturing Practices ("GMPs") as described in the Food and Drug Administration "Guide to Minimize Microbial Food Safety Hazards for Fresh Fruits and Vegetables" and in Title 21 of the Code of Federal Regulations, as the same may be amended from time to time. Vendor shall provide Walgreen with written verification by an independent third party auditor of Vendor's compliance with GAPs and GMPs in accordance with Walgreen's rules or as otherwise notified by Walgreen, as such rules may be amended from time to time. Such representations and warranties are in addition to all other warranties in connection with the merchandise, whether expressed or implied, including any warranties provided by any statute or regulation.

7) Vendor represents and warrants with respect to over the counter, supplements and similar products that, (a) to the extent that Walgreen receives rebates, discounts, incentives or any other price reductions from Vendor as a result of purchases made under this Agreement, Vendor shall in accordance with 42 C.F.R. 1001.952(h)(2)(iii)(B), fully and accurately report such rebates, discounts, incentives or price reductions on any invoices, coupons or statements submitted by Vendor. To the extent that Walgreen receives rebates, discounts, incentives or any other price reductions from Vendor as a result of purchases made under this Agreement, Walgreen may have an obligation to report such rebates, discounts, incentives or price reductions to federal or state health care programs pursuant to 42 C.F.R. 1001.952(h)(l); and (b) any merchandise shipped to Walgreen shall bear, upon its arrival at Walgreen, an effective expiration of at least twelve (12) months (or the best dating that is available at the time of shipment) after receipt by Walgreen of such merchandise. Vendor may offer merchandise with shorter dating and, if the substitute merchandise is accepted by Walgreen, the merchandise will be deemed acceptable or Walgreen may return such merchandise for full refund. Furthermore, Walgreen may agree in writing, from time to time, in its sole discretion to accept merchandise that has a shorter expiration date.

8) For merchandise that is imported into the United States and for which the Foreign Supplier Verification Programs ("FSVP") requirements of the FD&C Act apply (as implemented by the United States Food and Drug Administration ("FDA") under 21 C.F.R. §§ 1.500 to 1.514), Vendor represents and warrants that it shall implement and comply with all recommendations and requirements of the FDA's FSVP. At a minimum, and to the extent required under FSVP regulations, Vendor shall: (a) identify and evaluate the hazards in the foods products that it imports, (b) evaluate its supplier's performance and the risk presented by the food product, (c) conduct supplier verification activities, (d) engage in corrective actions, as needed and required, (e) reevaluate hazards and reassess the program periodically, (f) maintain required documentation; and (g) identify itself as the FSVP importer for purposes of Customs and Boarder Protection entry documents. To the extent that Vendor conducts business with a third party that meets the definition of an importer under the FSVP regulations, Vendor shall require that third party to implement and comply with FSVP requirements.

9) Vendor grants to Walgreen a nonexclusive, nontransferable, royalty free license to use, with the right to sublicense, Vendor's trademarks, intellectual property, service marks, trade names, trade dress, copyrights and rights of publicity associated with merchandise for the purpose of Walgreen's marketing, promoting or selling merchandise through any promotional, advertising or distribution channel, including, without limitation, print, television, radio or worldwide web.

10) Neither the merchandise described in any purchase order nor the terms set forth herein shall be modified in any way, except pursuant to a written instrument signed by an authorized officer of Walgreen. Walgreen may transmit such instrument by first class mail or overnight courier service, or via a secure electronic mail protocol.

11) Vendor agrees to provide Walgreen with written notice of any investigation, action or inquiry related to the merchandise instituted by Vendor or by any Federal, state or municipal regulatory authority within two business days of the commencement of any such investigation, action or inquiry, and to immediately notify Walgreen of any determination by such authority that the articles may not be compliant with applicable law.

**D. REQUIREMENTS**

1) All documents and other information provided to Vendor shall be considered confidential except to the extent Walgreen, in writing, designates to the contrary or as required by law.

2) Vendor will not use the name(s), trademark(s), intellectual property, or trade name(s), whether registered or not, of Walgreen in any publicity or press releases or advertising or in any manner, including customer lists, without Walgreen's prior written consent. Consent of Walgreen may be withheld in its sole and absolute discretion and shall not be valid unless obtained from a Walgreen Corporate Vice President and its Department of Corporate Communications.

3) The terms and conditions hereof, including without limitation the warranties, guaranties, and indemnities contained herein, are extended to the parent and affiliates of Walgreen and its and their representatives.

4) Vendor shall defend, indemnify, and hold Walgreen, its subsidiaries and affiliates, and each of their directors, officers, shareholders, employees and representatives (collectively, the "**Indemnified Parties**") harmless from and against any and all claims, actions and proceedings in any way related to all or any of the merchandise covered by any purchase order, together with any and all loss, cost, penalty, fine, damage, liability or expense (including, but not limited to, reasonable attorneys' fees and costs of litigation) incurred by or on behalf of any Indemnified Party in connection therewith ("**Expenses**"). Without limiting the generality of the foregoing, Vendor shall defend, indemnify, and hold the Indemnified Parties harmless from all Expenses incurred by reason of: (i) any design, trade dress, trade secret, patent, trademark, intellectual property, or copyright litigation, including, but not limited to, any claims of direct, contributory, or willful infringement, or inducement to infringe, now existing or hereafter commenced with respect to any or all items delivered by Vendor; (ii) any claims or demands of any kind which any purchaser or user of such merchandise may make against Walgreen arising from the use of such merchandise or from any patent or hidden defects in the quality of such merchandise or the dangerous condition thereof or the negligence of Vendor or its agents; and (iii) the breach by Vendor of any representation or warranty. If Walgreen so directs, Vendor shall, at its sole expense, defend the Indemnified Parties against any and all such claims, actions and proceedings. In the event Vendor fails or refuses to provide such defense, or if having commenced such defense, Vendor fails to diligently pursue the same, then an Indemnified Party may commence its own defense at Vendor's sole expense.

5) Vendor shall procure and maintain insurance coverages on an occurrence basis adequate to cover its indemnity obligations above, but in any event not less than amounts reasonably required by Walgreen including, without limitation, product liability insurance naming Walgreen Co. as Additional Insured with limits as required on Walgreen's SupplierNet website located at https://vendor.walgreens.com from a duly licensed insurance company maintaining an A.M. Best's Rating of A-/VII or better. Vendor shall provide an insurance certificate in form and substance acceptable to Walgreen evidencing such coverages upon execution of this agreement and at the annual renewal of the insurance policies required herein.

6) Vendor may not assign its obligations hereunder without Walgreen's express written consent. No assignment of, or granting of a security or other interest in Vendor's right to receive payment hereunder shall be binding upon Walgreen, unless Vendor so directs Walgreen in writing and Walgreen acknowledges the same in writing; and Vendor shall remain liable for each of its obligations unless and until released in writing by Walgreen. Any such assignee or security or lien holder shall be subject to the terms and conditions hereof and to all defenses, claims, and offsets available to Walgreen in connection herewith.

7) As applicable to vendors of fresh produce, during the term of any supply arrangements between Walgreen and Vendor, Walgreen, or its designated representative, shall have the right, at periodic intervals and during reasonable business hours, to (i) examine all records of Vendor insofar as they relate to the supply arrangements between Vendor and Walgreen; and (ii) inspect, analyze and test (including, but not limited to, cutting) Vendor's merchandise and means and methods of production of merchandise. Such audit, inspection and testing rights of Walgreen shall include rights of access to fields, packing houses, manufacturing facilities and any other facilities owned or operated by Vendor or by third parties who handle or otherwise manage Vendor's merchandise.

8) At any time and from time to time, at Walgreen's request, Vendor shall, at Vendor's expense, conduct quality attributes tests in accordance with Walgreen's standards and methodology. Vendor shall report the results of such tests to Walgreen in writing.

9) Vendor shall be responsible for all reasonable costs and expenses incurred by Walgreen in association with a recall, product withdrawal, safety notice or similar action that pertains to merchandise supplied by Vendor to Walgreen and which occurred because of a condition in existence at the time of delivery to Walgreen or resulted therefrom.

10) Vendor agrees to promptly notify Walgreen upon receipt of notice of a credible claim or potential claim of a defect in or tampering with any merchandise supplied by Vendor to Walgreen. Vendor, at its expense, will conduct reasonable tests and analysis to determine the accuracy of any such claim and the cause of any alleged defect or tampering. The parties agree to cooperate to implement any necessary product recalls, withdrawals, safety notices or similar actions.

11) This Agreement shall be construed in accordance with the substantive laws of the State of Illinois, without regard to principals of conflict or choice of law. The parties hereby consent to the exclusive jurisdiction of the courts of the State of Illinois or Federal District Court of the Northern District of Illinois and agree to waive all objections as to venue and forum non conveniens.

12) In the event of a conflict between these terms or any purchase order issued by Walgreen, and any document issued by Vendor, the terms of this Agreement shall control.

13) In the event Walgreen's business is discontinued by reason of fire, flood, earthquake, war, act of God, or other cause beyond the reasonable control of Walgreen, Walgreen may cancel undelivered orders upon reasonable notice.

## E. COMPLIANCE

1) Vendor is subject to all policies, procedures, terms and conditions as posted on Walgreen's SupplierNet website located at https://vendor.walgreens.com and all such policies, terms and conditions, as updated from time to time, are hereby incorporated herein and made a part hereof.

2) Vendor represents and warrants that all sales of merchandise to Walgreen will be made at no less than fair value under the United States antidumping law and that no government has provided a countervailable subsidy for merchandise actionable under U.S. law. Vendor understands that merchandise may be, either now or in the future, subject to one or more trade remedy proceedings (e.g., anti-dumping, countervailing duty, safeguard) in the United States or any other country, the purpose of which is to impose additional duties or other charges on the goods. If the United States Government ("USG") or any other government entity (the "**Competent Authorities**") initiates such proceedings against merchandise, Vendor agrees that, at Walgreen's request, Vendor will cooperate fully with Walgreen and with requests for information from the Competent Authorities. Vendor further understands and agrees that such cooperation may require it to provide confidential sales and cost information to the Competent Authorities so that they can calculate the amount of the duty or other charge on the goods. If the merchandise is already subject to anti-dumping duties, countervailing duties, safeguard measures, or other charges, Vendor agrees that, at Walgreen's request, Vendor will cooperate fully with Walgreen and the Competent Authorities in any administrative, interim, sunset, or other "reviews" of those duties or other charges. Vendor understands that such cooperation may require it to provide confidential sales and cost information to the Competent Authorities in order to adjust or eliminate the amount of the duty or other charge on the goods. At all times before, during, or after the initiation of a trade remedy proceeding in the United States or any other country, Vendor agrees to take all available steps necessary to minimize the risk that additional duties or other charges may be imposed on its goods sold to Walgreen.

3) For Vendor's goods to be imported into the United States, Vendor shall accept, implement, and comply with all applications, recommendations or requirements of the United States Customs Service's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative (for information go to http://www.cbp.gov/xp/cgov/trade/cargo_security/ctpat/). At Walgreen's or the Customs Service's request, Vendor shall certify in writing its acceptance, implementation, and compliance with the C-TPAT and any accompanying recommendations and guidelines. Vendor shall indemnify and hold Walgreen harmless from and against any liability, claims, demands or expenses (including attorneys' fees or other professional fees) arising from or relating to Vendor's failure to accept, implement or comply with C-TPAT.

4) Vendor shall comply with the applicable provisions of Executive Order 11246 and the regulations issued pursuant thereto (generally Part 60-1 of Title 41 of the Code of Federal Regulations), unless exempted by said regulations, particularly the provisions of the Equal Opportunity Clause (41 CFR Section 60-1.4(a)), which are incorporated herein by reference; the provisions and regulations pertaining to nondiscrimination and affirmative action in employment (41 CFR Sections 60-1.4, 1.40, 1.41 and 1.42), and the filing of Standard Form 100 (EEO-1). Vendor certifies, in accordance with the requirements of 41 CFR Section 60-1.8), that its facilities for employees are not segregated. In addition, Vendor shall comply with the provisions of the Affirmative Action Clause for Workers with Disabilities (41 CFR Section 60-741.5), and for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR Section 60-250.5), which are also incorporated herein by reference.

5) Vendor shall at all times comply with Vendor Responsibility Standards ("**VRS**") promulgated by Walgreen, as may be amended from time to time in Walgreen's sole discretion. Vendor acknowledges and agrees that Vendor has read and shall comply with VRS as found at https://vendor.walgreens.com.

6) Walgreen Post Audit Policy, posted at https://vendor.walgreens.com is hereby incorporated herein and made a part hereof.

7) Vendor shall at all times comply with the Walgreen Co. Anti-Corruption Policy for Vendors as may be amended from time to time. Vendor acknowledges and agrees Vendor has read and shall comply with this policy as found at https://vendor.walgreens.com.

8) Antitrust Claims. Vendor hereby transfers, conveys and assigns to Walgreen all right, title, and interest in and to all claims and/or causes of action that Vendor may have under the antitrust laws of the United States or any State thereof (including Puerto Rico) or Canada arising out of or relating to Vendor's past, present or future purchases of: (a) any raw material or other item that Vendor sold, sells or will sell to Walgreen in any form; and (b) any raw material or other item that is included in any product that Vendor has sold, sells or will sell to Walgreen; provided, however, that this assignment shall be only of that portion of the claims and/or causes of action of Vendor that relates to the raw materials or other items that Vendor shall have sold to Walgreen or that is included in any product sold to Walgreen, and not to that portion of the claims and/or causes of action of Vendor that relate to raw materials or other items that Vendor shall have sold to other customers or that is included in any product sold to other customers or that Vendor has retained for its own use. Upon request by Walgreen, Vendor shall promptly execute assignments of claims or causes of action to evidence the foregoing assignment.

9) The Parties hereby exclude the U.N. Convention on Contracts for the International Sale of Goods from this Agreement, and any transaction between them related thereto.

## F. GENERAL

1) The terms of electronic data interchange and, Drop-Shipping (as defined in Exhibit 2), attached hereto as Exhibits 1, and 2, respectively, are incorporated herein by this reference, if and as applicable.

2) This Agreement, together with all exhibits and attachments, constitute the complete Agreement of the parties relating to the matters specified in this Agreement and supersede all prior representations or agreements, whether oral or written, with respect to such matters. No oral modification or waiver of any of the provisions of this Agreement shall be binding on either party. This Agreement is for the benefit, and shall be binding upon, the parties and their respective successors and assigns.

**EXHIBIT 1**

**TERMS AND CONDITIONS OF ELECTRONIC DATA INTERCHANGE**

**WHEREAS,** Walgreen and Vendor desire to facilitate their purchase and sale transactions ("**Transactions**") by electronically transmitting and receiving data in agreed formats in substitution for conventional paper based documents, and

**WHEREAS,** the parties wish to document and memorialize their respective agreements with respect to each such Transaction,

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the parties agree as follows:

1) **PREREQUISITES**

   a) **Documents; Standards.** Each party may electronically transmit to or receive from the other party any of the documents listed in the Appendix attached hereto and made a part hereof (hereinafter referred to as "**Documents**"). Any transmission of data, which is not a Document, shall have no force or effect between the parties. All Documents shall be transmitted in accordance with the standards set forth in the Appendix. If any of such standards are modified, supplemented or enhanced and if Walgreens intends to adopt such modified, supplemented or enhanced standards, it may give Vendor notice of the same. Vendor agrees to likewise adopt such modified, supplemented or enhanced standards within a mutually agreed upon date after receipt of such notice, and such standards, as so modified, shall then be deemed incorporated into the Appendix.

   b) **Third Party Service Providers.** Documents will be transmitted electronically to each party either directly or through any third party service provider with which either party may contract. Either party may modify its election to use, not to use, or to change a service provider upon 30 days prior written notice to the other.

      i) Each party shall be responsible for the cost of any third party service provider with which it contracts, unless otherwise set forth in the Appendix.

      ii) As between the parties hereto, each party shall be liable for the acts or omissions of its third party service provider while transmitting, receiving, storing or handling Documents or performing related activities for such party; provided that if both parties use the same third party service provider to effect the transmission and receipt of a Document, as between the parties hereto, the originating party shall be liable for the acts and omissions of such third party service provider as to such Document.

   c) **System Operations.** Each party, at its own expense, shall provide and maintain the equipment, software, services and testing necessary to effectively and reliably transmit and receive Documents.

   d) **Security Procedures.** Each party shall properly use those security procedures, including those specified in the Appendix, if any, which are reasonably sufficient to insure that all transmissions and Documents are authorized and to protect its business records and data from improper access.

   e) **Signatures.** Each party shall adopt as its signature, an electronic identification consisting of symbols or codes ("**Signature**") which are to be affixed to or contained in each envelope transmitted by such party. Each party agrees that any Signature of such party affixed to or contained in any transmitted envelope shall be sufficient to verify that such party originated such envelope. Neither party shall disclose to any unauthorized person the Signatures of the other party.

2) **TRANSMISSIONS**

   a) **Receipt.** Documents shall not be deemed to have been properly received and no Document shall give rise to any obligation until accessible to the receiving party at such party's Receipt Computer.

   b) **Verification.** Upon proper receipt of any Document, the receiving party shall promptly and properly transmit a Functional Acknowledgment in return, unless otherwise specified in Appendix. A, a "**Functional Acknowledgment**" shall constitute conclusive evidence that a Document has been properly received.

   c) **Acceptance.** If acceptance of a document is required by the Appendix, any such Document which is improperly received shall not give rise to any obligation unless and until the party initially transmitting such Document has properly received in return an acceptance Document.

   d) **Garbled Transmissions.** If any transmitted Document is received in an unintelligible or garbled form, the receiving party shall promptly notify the originating party (if identifiable from the received Document) in a reasonable manner. In the absence of such a notice the originating party's records of the contents of such Documents shall control.

   e) **Paper Transmissions.** Either party, after notice to the other party in writing, may send any Document to the other party by means of written instruments provided that no such written instrument shall modify or conflict with the terms and provisions of these Terms and Conditions of Electronic Data Interchange (these "**T&C**"), which shall be deemed to govern any such written instrument.

3) **TRANSACTION TERMS**

   a) **Terms and Conditions.** These T&C are to be considered part of any other agreement referencing it or referenced in the Appendix. In the absence of any other written agreement applicable to any Transaction made pursuant to these T&C, such Transaction (and any related communication) shall also be subject to the terms and conditions included in either party's standard printed applicable forms attached to or identified in the Appendix, as the same may be amended from time to time by either party upon written notice to the other. The parties acknowledge that the terms and conditions set forth in such forms may be inconsistent, or in conflict, but agree that any conflict that arises between the parties in connection with any such Transaction will be resolved as if such Transaction had been effected through the use of such forms.

b) **Prevailing Terms.** The terms of these T&C shall prevail in the event of any conflict with any other terms and conditions applicable to any Transaction.

c) **Confidentiality.** All information contained in any Document or otherwise exchanged between the parties shall be considered confidential except to the extent that the parties, in writing, designate that the same or any portion thereof is not confidential or except as may be required to comply with law.

4) **VALIDITY; ENFORCEABILITY**

a) **Obligations.** These T&C have been executed by the parties to evidence their mutual intent to create binding purchase and sale obligations pursuant to the electronic transmission and receipt of Documents specifying certain of the applicable terms.

b) **Proper Transmission.** Any Document properly transmitted pursuant to these T&C shall be considered, in connection with any Transaction, any other written agreement described in Section 3(a), or these T&C to be a "writing" or "in writing;" and any such document when containing or to which there is affixed a Signature shall be deemed for all purposes to have been "signed" and to constitute an "original" when printed from electronic files or records established and maintained in the normal course of business.

c) **Conduct.** The conduct of the parties pursuant to these T&C, including the use of signed Documents properly transmitted, shall, for all legal purposes, evidence a course of dealing and a course of performance accepted by the parties in furtherance of these T&C, any Transaction and any other written agreement described in Section 3(a).

d) **Admissibility.** The parties agree not to contest the validity and enforceability of signed Documents under the provisions of any applicable law relating to whether certain agreements are to be in writing or signed by the party to be bound thereby. Signed Documents, if introduced as evidence on paper in judicial, arbitration, mediation or administrative proceedings, will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Neither party shall contest the admissibility of copies of signed Documents under either (i) the business records exception to the hearsay rule or (ii) the best evidence rule on the basis that the signed Documents were not originated or maintained in documentary form.

5) **MISCELLANEOUS**

a) **Term.** These T&C shall remain in effect until terminated by either party on thirty (30) days' prior written notice, which notice shall specify the effective date of termination; provided, however, that any termination shall not affect the respective obligations or rights of the parties arising under any Documents or otherwise under these T&C prior to the effective date of termination.

b) **Severability.** Any provision of these T&C which is determined to be invalid or unenforceable will be ineffective to the extent of such determination without invalidating the remaining provisions of these T&C or affecting the validity or enforceability of such remaining provisions.

c) **Force Majeure.** No party shall be liable for any failure to perform its obligations in connection with any Transaction or Document if such failure results from any act of God or other cause beyond such party's reasonable control, including, but not limited to, any mechanical, electronic or communications failure which prevents such party from transmitting or receiving any Documents. However, the foregoing shall not apply to either party's failure to comply with the terms of any Document that has been properly received and acknowledged.

d) **Designee.** Vendor may designate, by separate written authorization, sent to Walgreen, a third party ("Broker") to enter into the Transactions contemplated by these T&C on behalf of Vendor. In such event, Broker shall be deemed to have authority to bind Vendor, to send and receive transmissions hereunder and do all other things that Vendor is obligated or permitted to do under these T&C. In so doing, Broker's acts (or failure to act) shall be binding upon Vendor in the same manner as if done (or failed to be done) by Vendor. Any liabilities resulting from the acts or omissions of Broker shall inure to Vendor. Walgreens shall have no obligation to otherwise confirm such authority. Vendor may retract or modify such authority only by written notice sent to Walgreens.

e) **Attachments.** Appendices A, B-1 and B-2 are attached hereto and incorporated herein by this reference.

**APPENDIX A**

**POTENTIALLY TRADED DOCUMENTS**

| Transaction Set | Document Name | Standard | Version | Acknowledgement Required (Yes/No) | Acknowledgement Type |
|---|---|---|---|---|---|
| 180 | Return Merchandise Authorization and Notification | X.12 | 4010 | Yes | FA - 997 |
| 214 | Transportation Carrier Shipment Status Message | X.12 | 4010 | Yes | FA - 997 |
| 810 | Invoice | X.12 | 4010 | Yes | FA - 997 |
| 811 | Consolidation Service Invoice/ Statement | X.12 | 4010 | Yes | FA - 997 |
| 820 *EFT Agreement Required | Remittance Advice | X.12 | 4010 | Yes | FA - 997 |
| 830 | Planning Schedule with Release Capability | X.12 | 4010 | Yes | FA - 997 |
| 832 | Price/Sales Catalog | X.12 | 4010 | Yes | FA - 997 |
| 850 * General Trade Agreement Required | Purchase Order | X.12 | 4010 | Yes | FA - 997 |
| 852 *Non-Disclosure Agreement Required | Product Activity Data | X.12 | 4010 | Yes | FA - 997 |
| 855 | Purchase Order Acknowledgment | X.12 | 4010 | Yes | FA - 997 |
| 856 | Advance Ship Notice | X.12 | 4010 | Yes | FA - 997 |
| 860 | Purchase Order Change | X.12 | 4010 | Yes | FA - 997 |
| 861 | Receiving Advice/ Acceptance Certificate | X.12 | 4010 | Yes | FA - 997 |
| 864 | Text Message | X.12 | 4010 | Yes | FA - 997 |
| 867 | Product Transfer and Resale Report | X.12 | 4010 | Yes | FA - 997 |

**COMMUNICATION IDs:**

The T&C apply to the following trading partner communication ID's and any future modifications to such ID's:

Current:                                                    Previous (if applicable):

Test Qualifier _____    Comm ID _____    Test Qualifier _____    Comm ID _____

Production Qualifier _____    Comm ID _____    Production Qualifier _____    Comm ID _____

**THIRD PARTY SERVICE PROVIDERS:**

Global eXchange Services (GXS):     500 W. Monroe Street, 11th Floor
                                    Chicago, IL 60661
                                    Phone:  (800) 334-2255

Interconnect through GE to:     _____
                                _____
                                Phone: _____

**ALLOCATION OF PROVIDER COSTS:**

Walgreen and Vendor will each pay for all electronic communications between their own processing location and their own mailbox at the VAN. The receiving party will be responsible for any applicable data storage fees.

Third parties (i.e., Brokers) receiving electronic carbon copies are responsible for fees associated with placing such copies in their VAN mailbox.

**BROKER** (if applicable):

Broker Name:     _____

Phone Number:     (_____) _____

Key Contact:     _____

**APPENDIX B-1**

**DOMESTIC ORDER SHIPPING INSTRUCTIONS**

1.  Walgreen reserves the right to countermand any order or any part thereof, prior to the date of shipment.

2.  All bills of lading, freight bills and cargo receipts covering shipments to Walgreen's distribution centers or stores must show Walgreen's Purchase Order number or other document number as designated by Walgreen.

3.  Vendors and carriers must schedule a delivery appointment prior to shipping for all shipments over 200 cartons. Receiving appointments will be made weekdays between 7:00 AM and 3:00 PM. Receiving department closes at 4:30.

4.  Incomplete shipments must indicate whether balance to follow or balance canceled.

5.  Each Purchase Order shall be invoiced separately.

6.  Substitutions will not be accepted without written authorization of Walgreen.

7.  Vendor will not deliver merchandise that has an expiration date of less than 12 months unless agreed upon in writing prior to Walgreen's issuance of a purchase order for such merchandise.

**Carton markings:**

1.  All cases are to be marked with (i) shipping container code (SCC bar code) if applicable; (ii) product description, (iii) inner case pack (if any); (iv) manufacturer's stock number (to be printed on the side and NOT the top of the carton).

2.  For cartons in which a packing slip is enclosed, the carton must be so labeled on its outside.

3.  If a packing slip is not enclosed, each carton should be labeled so as to show style and quantities within said carton.

4.  <u>REFRIGERATED PRODUCTS:</u> Mark manifest packing slip & outside of carton:

**\*\*\*REFRIGERATED PRODUCTS\*\*\***

**APPENDIX B-2**

**IMPORT ORDER SHIPPING INSTRUCTIONS**

1. All consumer packaging must conform to the U.S. Governmental Regulations.
2. Country of origin and distribution line must be indicated on private label packages:

   Walgreen Co.
   Deerfield, Illinois 60015

   (Note: If factory packaging is used, Walgreen Co. distribution line is not necessary.)
3. Export cartons must be marked with the following information on ALL FOUR SIDES :



6 Digit item number (WIC) inside diamond

| | |
|---|---|
| Description | _____ |
| Case Pack: | _____ |
| Weight: | _____ |
| Cube: | _____ |
| Country of origin: | _____ |
| CPSIA Tracking Code | _____ |

GTIN Barcode should appear at bottom right side of each printed panel.

**\*FRAGILE MARKINGS WHEN NEEDED\***

1. Letter of credit will provide specific shipping instructions as to Port of Entry, shipping line or consolidator, and notify party.
2. Original set of documents shall be provided to Walgreen's selected freight forwarder no later than three (3) days from the date of departure of goods from the point of origin:

   Walgreen Co., Import Dept., M. S. #2101
   200 Wilmot Road, Deerfield, Illinois 60015.
3. All documentation required by U.S. Customs shall be prepared and delivered in accordance with applicable regulations. The commercial invoice shall indicate the following information:
   A. Name of Vessel and voyage number
   B. Purchase order number and Walgreen item code
   C. A detailed description of merchandise indicating its function or method of operation (Example: battery operated, spring action, etc.) and usage or purpose
   D. Free on board ("FOB") price showing cost breakdown components: material type, labor, packaging, transport charges to port
   E. Country of origin and the correct harmonized tariff number for each item
   F. Manufacturer's name and address
4. For Full Container Load ("FCL") Shipments, the packaging list must contain the following information:
   A. Name of Vessel and voyage number
   B. Purchase order number
   C. Walgreen item code ("**WIC**")
   D. Number of cases for each item as well as description of merchandise
   E. Indicate container number and list number of cases for each item being loaded by Walgreen item code
   F. Case weight (gross) and net case cube (length x width x height in cubic meters)
5. For Less-than Container Load ("LCL") shipments, a packing list must accompany the shipment when delivered to consolidator in consolidator's appointed port and must indicate the following:
   A. Purchase order number
   B. WIC
   C. Destination city
   D. No. of cases by WIC number
   E. Case weight (gross) and net case cube (length x width x height in cubic meters)

Any questions concerning the above instructions may be directed to the
Import Department in Deerfield, Illinois USA:     Phone number:     (847) 527-4341
                                                 Fax number       (847) 527-4369

**EXHIBIT 2**

**TERMS AND CONDITIONS FOR DROP-SHIPPING**

Walgreen's customers may order certain of Vendor products through Walgreen's websites, whereby Vendor will ship said products directly to Walgreen's customers at locations specified by such customers (**"Drop-Ship"** or **"Drop-Shipping"**). To the extent that Vendor Drop-Ships, the following provisions shall apply and govern for Drop Ship transactions:

1. Vendor's merchandise return policy shall be as follows: Vendor shall take back product from Walgreen's customers returned as a result of customers' buyer's remorse and defective merchandise up to thirty (30) days from purchase invoice date. Vendor shall issue credit memo(s) pursuant to agreement terms payable to Walgreen for any outstanding return balance amount following return of product(s). If, for any reason, Vendor's product is returned, and the Agreement has been terminated, Vendor will issue a check payable to Walgreen, in the outstanding balance amount. Walgreen will not be subject to any fees and/or surcharges for returned items.

2. Vendor will use Walgreen's designated third party electronic data interface supplier for Drop-Ship transactions (which Walgreen may change from time to time in Walgreen's sole discretion), pursuant to the terms and conditions of the agreement between said supplier and Vendor, to provide inventory to Walgreen's website and process transactions with Walgreen's customers.

3. Vendor shall comply with the California Consumer Privacy Act as the same may be promulgated, supplemented or amended from time to time (**"CCPA"**). To the extent Vendor receives or has access to Walgreen's customers' personal information, as such term is defined under CCPA (**"Customer PII"**) in order to drop-ship Merchandise or provide other services or information to such customers (**"Drop-Ship Services"**), Vendor shall only use, disclose, or otherwise process such Customer PII only as necessary to perform Drop-Ship Services. Vendor is prohibited from retaining, using or disclosing Customer PII for any purpose other than providing Drop-Ship Services to Walgreen's customers and shall, upon Walgreen's request, confirm that any authorized subcontractor or third party to whom Vendor discloses or provides access to Customer PII is subject to these same obligations along with any confidentiality obligations set forth in the GTA and any agreement between Vendor and such subcontractor or third party. Vendor shall (i) delete Customer PII as Walgreen directs and (ii) provide Walgreen access to Customer PII that Vendor maintains to enable Walgreen to comply with applicable laws, including but not limited to CCPA.

4. Vendor shall comply with Walgreen's policies for Drop-Ship vendors. Walgreen reserves the right to receive a credit or refund from Vendor for Vendor's failure to comply with Walgreen's policies for Drop-Ship Vendors.

# EXHIBIT 2

**U. S. ENVIRONMENTAL PROTECTION AGENCY**
**REGION 6**
**1201 Elm Street, Suite 500**
**Dallas, Texas 75270**

| | | |
|---|---|---|
| In the Matter of | § | |
| | § | |
| Aktive Health, LLC, | § | Docket No.  FIFRA-06-2021-0312 |
| | § | |
| Respondent. | § | |

## STOP SALE, USE, OR REMOVAL ORDER

### Jurisdiction

1.      This Stop Sale, Use, or Removal Order (Order or SSURO) is issued pursuant to

the authority of Section 13(a) of the Federal Insecticide, Fungicide, and Rodenticide Act

("FIFRA"), 7 U.S.C. § 136k(a), as amended. Section 13(a) of FIFRA, 7 U.S.C. § 136k(a),

authorizes the Administrator of the U.S. Environmental Protection Agency ("EPA") to issue an

order prohibiting the sale, use, or removal of any pesticide or device by any person who owns,

controls, or has custody of such pesticide or device whenever there is reason to believe that the

pesticide or device is in violation of any provision of FIFRA, or the pesticide or device has been

or is intended to be distributed or sold in violation of any provision of FIFRA.

### Parties

2.      Complainant is the Director of Enforcement and Compliance Assurance Division

of the EPA, Region 6, as duly delegated by the Administrator of the EPA and the Regional

Administrator, EPA, Region 6.

3.      Respondent is Aktive Health, LLC, a company formed in the state of Texas and

conducting business in the state of Texas.

### Statutory and Regulatory Authority

4.  Section 12(a)(1)(A) of FIFRA, 7 U.S.C. § 136j(a)(1)(A), provides that it is unlawful for any person in any State to distribute or sell to any person any pesticide that is not registered under Section 3 of FIFRA, 7 U.S.C. § 136a.

5.  Section 2(s) of FIFRA, 7 U.S.C. § 136(s), defines "person" as any individual, partnership, association, corporation, or any organized group of persons whether incorporated or not.

6.  Section 2(gg) of FIFRA, 7 U.S.C. § 136(gg), defines "to distribute or sell" as to distribute, sell, offer for sale, hold for distribution, hold for sale, hold for shipment, ship, deliver for shipment, release for shipment, or receive and (having so received) deliver or offer to deliver.

7.  Section 2(u) of FIFRA, 7 U.S.C. § 136(u), defines "pesticide" as, *inter alia,* any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest and any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant.

8.  Section 2(t) of FIFRA, 7 U.S.C. § 136(t), defines "pest" as: (1) any insect, rodent, nematode, fungus, weed, or (2) any other form of terrestrial or aquatic plant or animal life or virus, bacteria, or other micro-organism (except viruses, bacteria, or other micro-organism on or in living man or other living animals) which the Administrator declares to be a pest under Section 25(c)(1).

9.  Pursuant to the regulation at 40 C.F.R. § 152.15, in relevant part, no person may distribute or sell any pesticide product that is not registered under the Act, except as provided in 40 C.F.R. §§ 152.20, 152.25, and 152.30. A pesticide is any substance (or mixture of substances) intended for a pesticidal purpose, i.e., use for the purpose of preventing, destroying, repelling, or

mitigating any pest or use as a plant regulator, defoliant, or desiccant. A substance is considered

to be intended for a pesticidal purpose, and thus to be a pesticide requiring registration, if the

person who distributes or sells the substance claims, states, or implies (by labeling or otherwise)

that the substance (either by itself or in combination with any other substance) can or should be

used as a pesticide.

## EPA Findings of Fact and Conclusions of Law

10.     Respondent is, and at all times referred to herein was, a "person" as defined by

Section 2(s) of FIFRA, 7 U.S.C. § 136(s).

11.     On or about December 2020, the EPA conducted an investigation of Respondent's

compliance with FIFRA and the federal regulations promulgated thereunder (the

"Investigation"). As part of the Investigation, the EPA requested, and Respondent provided

documentation and information concerning Respondent's distribution of pesticidal products.

12.     Beginning on or about June 1, 2020, Respondent distributed or sold, as those

terms are defined by Section 2(gg) of FIFRA, 7 U.S.C. § 136(gg), the following products:

   a. Aktive Disinfectant Wipes; and

   b. Aktive General Disinfecting & Cleaning Wet Wipes

(the Products).

13.     Labeling for Aktive Disinfectant Wipes states that the product "KILLS UP TO

99.9% OF GERMS."

14.     Germs are a "pest" as that term is defined by Section 2(t) of FIFRA, 7 U.S.C.

§ 136(t).

15.     Labeling for Aktive General Disinfecting & Cleaning Wet Wipes states that the

product "KILLS UP TO 99.9% OF VIRUSES & BACTERIA".

*In the Matter of Aktive Health, LLC*
*Docket No. FIFRA-06-2021-0312*

16.     Viruses and bacteria are "pests" as that term is defined by Section 2(t) of FIFRA, 7 U.S.C. § 136(t).

17.     The Products are "pesticides" as that term is defined by Section 2(u) of FIFRA, 7 U.S.C. § 136(u), because they are substances intended for preventing, destroying, repelling, or mitigating pests.

18.     The Products are "pesticides" as that term is further defined by 40 C.F.R. § 152.15, which require registration pursuant to Section 3 of FIFRA, 7 U.S.C. § 136a, because they are substances intended for pesticidal purposes for which Respondent stated by labeling when distributing and selling the Products that the Products can or should be used as a pesticide.

19.     At the time the Products were distributed or sold by Respondent, the Products were not registered pursuant to Section 3 of FIFRA, 7 U.S.C. § 136a.

20.     On December 13, 2020, the EPA sent Respondent a Notice of Potential Violation and Opportunity to Confer letter. On December 30, 2020, the EPA responded to the documentation and information received from Respondent as a result of the opportunity to confer and articulated the EPA's position concerning Respondent's compliance with FIFRA.

## Basis for the Order

21.     EPA has reason to believe, based on the information described in the EPA Findings of Fact and Conclusions of Law that Respondent distributed or sold the Products in violation of Section 12(a)(1)(A) of FIFRA, 7 U.S.C. § 136j(a)(1)(A).

## Order

22.     Pursuant to the authority of Section 13(a) of FIFRA, 7 U.S.C. § 136k(a), Respondent is hereby ordered to **immediately cease** the sale, use, or removal of the Products under its ownership, control, or custody, wherever such products are located, except in

*In the Matter of Aktive Health, LLC*
*Docket No. FIFRA-06-2021-0312*

accordance with the provisions of this Order, or until such time that the Products are in compliance with FIFRA.

23.     This Order shall apply to all quantities and container types and sizes of all of the Products controlled or within the custody of Respondent and any agent, contractor, employee, consultant, firm successor, and/or assign or other persons or entities acting on behalf of Respondent.

24.     The Products shall not be used, sold, offered for sale, held for sale, shipped, delivered for shipment, received, or having so received, shall not be delivered, offered for delivery, moved, or removed for disposal from any facility or establishment, for any reason, unless approved by EPA in writing, or until such time that the Products are in compliance with FIFRA.

25.     Any proposal for movement of the Products shall be submitted to Blake Sieminski at sieminski.blake@epa.gov and shall include:

   a.   The purpose for which movement is being requested;

   b.   An accounting of the quantities of Products to be moved, including location(s) and container size, and

   c.   The destination location to which the Products will be moved.

### General Provisions

26.     Violation of the terms or provisions of this Order may subject the violator to **CIVIL OR CRIMINAL PENALTIES** as prescribed in Section 14 of FIFRA, 7 U.S.C. § 136*l*.

27.     Respondent may seek federal judicial review of the Order pursuant to section 16 of FIFRA, 7 U.S.C. § 136n.

28.    If any provision or authority of the Order or the application of the Order to Respondent is held by federal judicial authority to be invalid, the application to Respondent of the remainder of the Order shall remain in full force and effect and shall not be affected by such a holding.

29.    The issuance of this Order shall not act as a waiver by the EPA of any enforcement or other authority available to the EPA under FIFRA.

30.    This order does not affect the obligation of Respondent to comply with all federal, state and local statutes, regulations and permits.

31.    This Order shall be **EFFECTIVE IMMEDIATELY** upon receipt by RESPONDENT.

32.    This Order shall remain in effect unless and until revoked, terminated, suspended, modified, or released by the EPA.

33.    EPA may subsequently amend this Order, in writing, in accordance with the authority of FIFRA. Any amendment will be transmitted to Respondent. In the event of any such subsequent amendment to this Order, all requirements for performance of this Order not affected by the amendment shall remain as specified in the original Order.

34.    Unless otherwise stated, all time periods stated herein shall be calculated in calendar days from such date.

## Other Matters

35.    For any additional information about this Stop Sale, Use or Removal Order please contact Blake Sieminski, EPA Region 6 Waste Enforcement Branch, at (214) 665-8062 or sieminski.blake@epa.gov. For any legal matters concerning this Order, you are encouraged to

*In the Matter of Aktive Health, LLC*
*Docket No. FIFRA-06-2021-0312*

contact Clarissa Howley Mills, Office of Regional Counsel, at (214) 665-6782 or

mills.clarissa@epa.gov.


Cheryl T. Seager
Director
Enforcement
 and Compliance Assurance Division
U.S. EPA, Region 6

*In the Matter of Aktive Health, LLC*
*Docket No. FIFRA-06-2021-0312*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Stop Sale, Use, and Removal Order

was sent this day in the following manner:

Transmitted via electronic mail to Respondent's representatives:

Christopher B. Clarke
Clark Hill PLC
cclare@clarkhill.com; and

Patrick J. Larkin
Clark Hill PLC
plarkin@clarkill.com

_____

Signed
Office of Regional Counsel
U.S. EPA, Region 6